Vincelette v. Court, 2026 NCBC 64.

STATE OF NORTH CAROLINA

IREDELL COUNTY

AMY VINCELETTE, individually
and derivatively on behalf of
Wellspring Nurse Source, LLC,

Plaintiff,

v.

KELLY COURT; MELISSA PEIRCE;
and WELLSPRING NURSE
SOURCE, LLC,

Defendants,

v.

WELLSPRING NURSE SOURCE,
LLC,

Nominal
Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CVS001161-480

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1. **THIS MATTER** is before the Court upon Plaintiff's Amended Motion for Partial Summary Judgment ("Plaintiff's Motion") filed on 23 January 2026 and Defendants' Motion for Partial Summary Judgment ("Defendants' Motion") filed on 26 January 2026 pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), in the above-captioned case.[1]

2. Having considered Plaintiff's Motion and Defendants' Motion, the parties' briefs and materials offered in support of and in opposition to each Motion, the arguments of counsel at the hearing on the Motions, and other appropriate matters

---

[1] Pl.'s Am. Mot. Partial Summ. J. [hereinafter, "Pl.'s MSJ"], ECF No. 107; Defs.' Mot. Partial Summ. J. [hereinafter, "Defs.' MSJ"], ECF No. 116.

of record, the Court hereby **GRANTS in part and DENIES in part** Plaintiff's

Motion and **GRANTS in part and DENIES in part** Defendants' Motion.

> *Rayburn Cooper & Durham, P.A., by Ross R. Fulton and Ashley B.
> Oldfield, for Plaintiff Amy Vincelette.*

> *Womble Bond Dickinson (US) LLP, by Patrick G. Spaugh and Emmett
> J. Whelan, for Defendants Kelly Court and Melissa Peirce and
> Defendant/Nominal Defendant Wellspring Nurse Source, LLC.*

Shirley, Judge.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

3.      While the Court does not make findings of fact on a motion for summary

judgment, "it is helpful to the parties and the courts for the trial judge to articulate a

summary of the material facts which he considers are not at issue and which justify

entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161-62 (2010) (citation and

quotation marks omitted).  Accordingly, the following background, drawn from the

undisputed evidence submitted by the parties, is intended only to provide context for

the Court's analysis and ruling and not to resolve issues of material fact.

4.      Plaintiff Amy Vincelette ("Ms. Vincelette" or "Plaintiff") and Defendants

Melissa Peirce ("Ms. Peirce") and Kelly Court ("Ms. Court") are longtime business

partners.[2]  In 2001, Ms. Vincelette and Ms. Peirce founded an IT staffing company,

---

[2] *See generally* Verified First Am. Compl. [hereinafter, "Am. Compl."], ECF Nos. 53
(redacted), 55 (sealed); *see also* Am. Compl., *The Wellspring Group, Inc. and Wellspring Nurse
Source, LLC. v. Melissa T. Peirce and Jamie M. Peirce*, Iredell County Superior Court 20-
CVS-1389 [hereinafter, "Prior Lit. Am. Compl."], ECF No. 38.  The Prior Litigation was a
mandatory complex business case previously before this Court.  The Court may take judicial
notice of the Prior Litigation among the parties.  *See Stocum v. Oakley*, 185 N.C. App. 56, 61
(2007) ("Trial courts may properly take judicial notice of its own records in any prior or

Wellspring Group, Inc. ("Wellspring Group").[3] Ms. Vincelette and Ms. Peirce were the sole and equal owners of the company.[4]

5. Ms. Vincelette and Ms. Peirce later joined Ms. Court to start Defendant Wellspring Nurse Source, LLC ("Nurse Source"), a healthcare professional staffing business.[5] Nurse Source is a member-managed limited liability company incorporated in Connecticut and headquartered in Iredell County, North Carolina.[6]

6. On 1 January 2019, Ms. Vincelette, Ms. Court, and Ms. Peirce entered into the First Amended and Restated Operating Agreement of Wellspring Nurse Source, LLC (the "Operating Agreement").[7] Pursuant to Schedule A to the Operating Agreement, Ms. Vincelette, Ms. Court, and Ms. Peirce are the sole owners and Members[8] of Nurse Source, with Ms. Vincelette and Ms. Court each holding a 33.33% membership and voting interest in Nurse Source and Ms. Peirce holding a 33.34% membership and voting interest.[9] At the time of the current action, the membership

---

contemporary case when the matter noticed has relevance.") (citation and quotation marks omitted).

[3] Am. Compl. ¶¶ 5, 9.

[4] Prior Lit. Am. Compl. ¶ 5; Index Exs. Pl.'s Br. Opp'n Defs.' Mot. Disqualify Pl.'s Couns., Ex. A [hereinafter, "Vincelette Decl."] ¶ 2, ECF No. 31; *see also* Am. Compl., Ex. D [hereinafter, "Settlement Agreement"], ECF Nos. 53.4 (redacted), 55.1 (sealed).

[5] Am. Compl. ¶¶ 1–3, 8.

[6] Am. Compl. ¶ 4.

[7] First Am. Restated Operating Agreement of Wellspring Nurse Source, LLC [hereinafter, "Operating Agreement"], ECF No. 69.1.

[8] As defined by the Operating Agreement.

[9] Operating Agreement, Schedule A; *see also* Am. Compl. ¶ 10.

composition of Nurse Source is at issue; Ms. Vincelette contends that she remains a Member of Nurse Source while Ms. Peirce and Ms. Court contend that she does not.[10]

7. The current dispute originates from the settlement of prior litigation among the parties.[11] On 27 May 2020, Wellspring Group and Nurse Source commenced an action in Iredell County Superior Court against Ms. Peirce and her husband, Jamie Peirce, who served as Chief Financial Officer of Nurse Source and Wellspring Group until his termination in July 2020, (the "Prior Litigation").[12] In the Prior Litigation, Wellspring Group and Nurse Source alleged that the Peirces had engaged in a years-long scheme to defraud and embezzle substantial sums from the companies.[13]

8. During the Prior Litigation, on 26 June 2020, Ms. Court and Ms. Vincelette voted by two-thirds vote to terminate the Peirces as employees of Wellspring Group for "Cause" based on their "admitted misappropriation of company funds, gross negligence and willful misconduct."[14] Pursuant to Section 11.14 of the Operating Agreement,[15] on 23 September 2020, Ms. Vincelette and Ms. Court notified Ms. Peirce

---

[10] *See, e.g.,* Am. Compl. ¶¶ 1, 115.

[11] *See* Am. Compl. ¶¶ 9, 27, 42, 78–80, 93–101, 120; Settlement Agreement.

[12] Am. Compl. ¶¶ 9, 11; *see also* Prior Lit. Am. Compl. ¶ 8.

[13] Prior Lit. Am. Compl. ¶¶ 12–17; see also Am. Compl. ¶ 14.

[14] Am. Compl. ¶ 20; Am. Compl., Ex. A, ECF No. 53.1. Plaintiffs claim that Ms. Court and Ms. Vincelette terminated the Peirces' employment from both Wellspring Group and Nurse Source on 26 June 2020. However, Exhibit A appears to be Wellspring Group minutes; by itself, it does not clearly establish termination of the Peirces as Nurse Source employees. Regardless, a later written consent on 29 October 2020 confirmed that the Peirces' employment with Nurse Source was terminated. *See* Am. Compl., Ex. C, ECF No. 53.3.

[15] Section 11.14(a) of the Operating Agreement provides:

that they were exercising their "right and option to purchase all of the Units owned by [Ms. Peirce] at fifty percent (50%) of the Appraised Value determined pursuant to Section 11.16(a)[.]"[16] Ms. Vincelette and Ms. Court affirmed their termination for Cause of Ms. Peirce and purchase of her Units at a duly called meeting on 12 October 2020 and by written consent on 29 October 2020, stating "Melissa Peirce and Jamie Peirce have misappropriated Company assets for their personal benefit and have grossly mismanaged the assets and finances of the company," and that their conduct was "to the material detriment of the Company."[17]

9.      On 21 January 2022, Wellspring Group, Nurse Source, and the Peirces entered into a Confidential Settlement Agreement and Release (the "Settlement Agreement") resolving the Prior Litigation.[18] Among other things, the Settlement Agreement required that, in exchange for payment of the Net Purchase Price ("NPP"), Ms. Peirce "assign, transfer, convey, and deliver to Nurse Source all Units of Nurse

---

[I]n the event the Company terminates a Member's employment for Cause . . ., then the Company and the Remaining Members shall have the exclusive right and option to purchase all or any portion of the Units owned by such Member at fifty percent (50%) of the Appraised Value determined pursuant to Section 11.16(a) to be payable in accordance with the terms set forth in Section 11.16(b). Notice of the exercise of the option granted pursuant to this Section 11.14 shall be given to (i) the Member within 90 days of the date on which the . . . Member's employment is terminated by the Company[.]

Operating Agreement § 11.14(a).

[16] Am. Compl., Ex. B, ECF No. 53.2; *see also* Am. Compl. ¶ 21.

[17] Am. Compl. ¶¶ 22–23; Am. Compl., Ex. C.

[18] Am. Compl. ¶ 27; Settlement Agreement.

Source that [Ms. Peirce] owns" and "withdraw and resign as a member, officer, employee and agent of Nurse Source."[19]

10. The Settlement Agreement required Nurse Source to pay $125,000 toward the NPP by 6 February 2023 and the remaining balance by 6 August 2023.[20] Nurse Source did not make the payments required under the Settlement Agreement.[21]

11. In a 20 November 2022 email to Ms. Vincelette, Ms. Court stated she was "pulling the settlement agreement[.]"[22] On 5 June 2023, Ms. Court and Ms. Peirce executed an "Action by Written Consent of the Members" (the "5 June 2023 Written Consent") and voted by an alleged two-thirds vote that purported to reinstate Ms. Peirce as a Manager and employee of Nurse Source to the extent that any prior termination had been effective.[23] Ms. Vincelette did not sign the 5 June 2023 Written Consent.[24]

12. On 4 August 2023, Ms. Vincelette demanded that Nurse Source pay Ms. Peirce the NPP in accordance with the Settlement Agreement.[25]

---

[19] Settlement Agreement ¶ 3(a); Am. Compl. ¶¶ 28–29, 32–33.

[20] Settlement Agreement ¶ 3(d).

[21] Am. Compl. ¶ 42; Br. Supp. Defs.' MSJ 6–7.

[22] Am. Compl. ¶ 42; Am. Compl., Ex. R, ECF No. 53.18.

[23] Am. Compl. ¶¶ 78–85; Am. Compl., Ex. M, ECF No. 53.13.

[24] Am. Compl., Ex. M.

[25] Am. Compl. ¶¶ 93–95; Am. Compl., Ex. N, ECF No. 53.14.

13.     The next business day, Ms. Court and Ms. Peirce executed an "Action by Written Consent of the Members" dated 7 August 2023 (the "7 August 2023 Written Consent") purporting to terminate Ms. Vincelette's employment for Cause.[26] The 7 August 2023 Written Consent also stated that Nurse Source, Ms. Court, and Ms. Peirce intended "to exercise the right and option to purchase all of the Units owned by Ms. Vincelette at 50% of the Appraised Value[.]"[27]

14.     Ms. Court and Ms. Peirce thereafter sent Ms. Vincelette a $140,000 check, claiming that it constituted payment for 50% of the Appraised Value of Ms. Vincelette's interest in Nurse Source.[28] Ms. Vincelette rejected and returned the $140,000 check to Ms. Court.[29] It is undisputed that Ms. Vincelette was not a paid employee of Nurse Source when Ms. Court and Ms. Peirce executed the 7 August 2023 Written Consent.[30]

15.     The parties dispute whether Ms. Vincelette's lack of employment rendered the 7 August 2023 Written Consent ineffective under the Operating Agreement.[31]

---

[26] Am. Compl. ¶¶ 96–101; Am. Compl., Ex. O, ECF No. 53.15.

[27] Am. Compl., Ex. O.

[28] Am. Compl. ¶ 103; Answer ¶ 103, ECF No. 93.

[29] Am. Compl. ¶ 114.

[30] Am. Compl. ¶ 179; Answer ¶ 179.

[31] Pl.'s Mem. Law Supp. Pl.'s Am. Mot. Partial Summ. J. [hereinafter, "Mem. Supp. Pl.'s MSJ"] 9–13, ECF No. 108; Defs.' Opp'n Pl.'s Am. Mot. Partial Summ. J. [hereinafter, "Opp'n Pl.'s MSJ"] 5–11, ECF No. 121.

The parties also dispute whether Ms. Peirce possessed voting rights when she joined Ms. Court in executing the 7 August 2023 Written Consent.[32]

16. Between November 2022 and February 2023, Wellspring Group transferred $275,000 to Nurse Source.[33] The parties agree that Nurse Source owes Ms. Vincelette at least $258,000 arising from those transfers.[34] The parties further agree that the intercompany transfers did not include written repayment terms.[35]

17. The parties dispute whether Ms. Court agreed that Nurse Source would pay Wellspring Group $72,500 to share equally in a $145,000 offset reflected in the Settlement Agreement.[36] They also dispute whether Ms. Court's management of Nurse Source's accounts receivable and Ms. Peirce's reinstatement injured Nurse Source or instead benefited it.[37]

18. On 17 November 2023, Ms. Vincelette made a written derivative demand on Nurse Source to "enforce, realize, and fulfill Nurse Source's rights and obligations under the Settlement Agreement and to investigate and take suitable action

---

[32] Mem. Supp. Pl.'s MSJ 13–17; Opp'n Pl.'s MSJ 11–17.

[33] Am. Compl. ¶ 126; Answer ¶ 126.

[34] Mem. Supp. Pl.'s MSJ 8–9; Opp'n Pl.'s MSJ 3; Mem. Supp. Pl.'s MSJ, Ex. 1 – Peirce Dep. 189:1–9, ECF No. 107.2; Mem. Supp. Pl.'s MSJ, Ex. 3 – Court Dep. 90:23–91:1, ECF No. 107.4.

[35] Opp'n Pl.'s MSJ 4; Defs.' Br. Supp. Mot. Partial Summ. J., Ex. 1 – Vincelette Dep. 77:7–21, ECF No. 117.2; Br. Supp. Defs.' MSJ, Ex. 6 – Brian Vincelette Dep. 25:9–11, ECF No. 117.7.

[36] Am. Compl. ¶ 135; Defs.' Br. Supp. Mot. Partial Summ. J. [hereinafter, "Br. Supp. Defs.' MSJ"] 19–20, ECF No. 117; Pl.'s Resp. Opp'n Defs.' Mot. Partial Summ. J. [hereinafter, "Opp'n Defs.' MSJ"] 17–19, ECF Nos. 124 (redacted), 126 (sealed).

[37] Br. Supp. Defs.' MSJ 10–15; Opp'n Defs.' MSJ 9–12.

regarding any corporate malfeasance and unlawful conduct by Kelly Court and Melissa Peirce, specifically including their collusive efforts to deprive Nurse Source of its rights under the Settlement Agreement and Amy Vincelette of her rights as a Member of Nurse Source."[38] No evidence or argument was presented by the Defendants that Nurse Source took the action requested in Ms. Vincelette's derivative demand.[39]

19. On 16 April 2024, Ms. Vincelette, individually and derivatively on behalf of Nurse Source, filed the complaint initiating the current action.[40] Ms. Vincelette filed the Verified First Amended Complaint on 27 November 2024.[41]

20. Defendants filed a Partial Motion to Dismiss on 3 January 2025.[42] On 30 July 2025, the Court entered an Order and Opinion on Defendants' Partial Motion to Dismiss Plaintiff's First Amended Complaint, dismissing part of Plaintiff's First Derivative Cause of Action for Declaratory Judgment, Third Derivative Cause of Action for Breach of Contract as asserted against Ms. Court, Fourth Derivative Cause of Action for Injunctive Relief, and part of the First Individual Cause of Action for Declaratory Judgment.[43]

---

[38] Am. Compl. ¶ 120; Derivative Demand, ECF Nos. 136.2 (sealed), 136.1 (redacted).

[39] Am. Compl. ¶ 122.

[40] Verified Compl., ECF Nos. 3 (sealed), 4 (redacted).

[41] Am. Compl.

[42] Defs.' Partial Mot. Dismiss Pl.'s First Am. Compl., ECF No. 67.

[43] Defs.' Partial Mot. Dismiss Pl.'s First Am. Compl., ECF No. 67; Order & Op. Defs.' Partial Mot. Dismiss Pl.'s First Am. Compl. [hereinafter, "Mot. Dismiss Order"], ECF No. 90.

21. On 23 January 2026, Ms. Vincelette voluntarily dismissed her Fifth Individual Cause of Action for Conversion as to Ms. Court, and Seventh Individual Cause of Action for Violation of Conn. Gen. Stat. § 34-255i(a).[44]

22. On 23 January 2026, Ms. Vincelette filed her Amended Motion for Partial Summary Judgment.[45] On 26 January 2026, Defendants filed their Motion for Partial Summary Judgment.[46] After full briefing, the Court held a hearing on Plaintiff's Motion and Defendants' Motion on 12 May 2026 (the "Hearing"), at which all parties were represented by counsel.[47] The Motions are now ripe for resolution.

## II.

## LEGAL STANDARD

23. Under Rule 56(c), "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Da Silva v. WakeMed*, 375 N.C. 1, 10 (2020) (quoting N.C. R. Civ. P. 56(c)). "A genuine issue of material fact is one that can be maintained by substantial evidence." *Curlee v. Johnson*, 377 N.C. 97, 101 (2021) (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more

---

[44] Notice Voluntary Dismissal Without Prejudice Individual Claim Five as to Kelly Court and Individual Claim Seven, ECF No. 113.

[45] Pl.'s MSJ.

[46] Defs.' MSJ.

[47] Notice Hr'g, ECF No. 134.

than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (cleaned up). "An issue is material if, as alleged, facts 'would constitute a legal defense, or would affect the result of the action or if its resolution would prevent the party against whom it is resolved from prevailing in the action.'" *Bartley v. City of High Point*, 381 N.C. 287, 292 (2022) (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972)). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022) (quoting Dalton v. Camp, 353 N.C. 647, 651 (2001)).

24. "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). The movant may meet this burden either (1) "by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense," or (2) "by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (cleaned up). If the movant meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a prima facie case at trial[.]" *Cummings v. Carroll*, 379 N.C. 347, 358 (2021) (cleaned up); see also N.C. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response,

by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

25. "For affirmative summary judgment on a party's own claim, the burden is heightened." *Futures Grp. v. Brosnan*, 2023 NCBC LEXIS 7, at *4 (N.C. Super. Ct. Jan. 19, 2023). The movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); accord Kidd v. Early, 289 N.C. 343, 370 (1976). Consequently, "rarely is it proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## III.

## ANALYSIS

26. Plaintiff moves for summary judgment on her remaining First Derivative Cause of Action for Declaratory Judgment, remaining First Individual Cause of Action for Declaratory Judgment, Second Individual Cause of Action for Breach of Contract against Ms. Court and Ms. Peirce, Fourth Individual Cause of Action for Breach of Contract against Nurse Source, and Eighth Individual Cause of Action for Breach of Operating Agreement against Nurse Source.[48]

27. Defendants move for summary judgment on Plaintiff's remaining First Derivative Cause of Action for Declaratory Judgment, Second Derivative Cause of

---

[48] Pl.'s MSJ.

Action for Breach of Fiduciary Duty, remaining Third Derivative Cause of Action for Breach of Contract, remaining Fourth Derivative Cause of Action for Specific Performance, Fifth Derivative Cause of Action for Civil Conspiracy, First Individual Cause of Action for Declaratory Judgment as to the request that Ms. Peirce could not vote on Ms. Vincelette's termination, Fourth Individual Cause of Action for Breach of Contract, Sixth Individual Cause of Action for Unjust Enrichment, Eighth Individual Cause of Action for Breach of Operating Agreement, and Ninth Individual Cause of Action for Breach of Fiduciary Duty.[49] Defendants also move the Court for summary judgment on Plaintiff's request for punitive damages, and on the issue of the applicability of Section 9.1(b) of the Operating Agreement to Plaintiff's claims against Ms. Court and Ms. Peirce.[50]

28. The Court will take up each claim and issue in turn.

## A. First Derivative Cause of Action

29. Two components of the First Derivative Cause of Action remain: (a) whether the 5 June 2023 Written Consent purporting to reinstate Ms. Peirce was invalid and without effect, and (b) whether Melissa Peirce and Jamie Peirce must reimburse Nurse Source for compensation and benefits received after that date.[51]

---

[49] Defs.' MSJ.

[50] Defs.' MSJ.

[51] Am. Compl. ¶¶ 146–48; Mot. Dismiss Order. ¶¶ 75(a), (e).

30.    Plaintiff seeks partial summary judgment only on the first of these remaining components.[52] Defendants seek summary judgment on both remaining components of the claim.[53]

31.    The North Carolina Declaratory Judgment Act authorizes the Court to determine questions concerning the construction or validity of a contract and to declare the parties' rights, status, and legal relations under that contract. N.C. Gen. Stat. § 1-254. The Court must first inquire whether Ms. Peirce's membership was terminated before the 5 June 2023 Written Consent.

32.    Plaintiff argues that Ms. Peirce's dissociation from Nurse Source occurred when her employment was terminated for Cause by an affirmative vote of two of the three Members under Sections 5.4 and 11.14 of the Operating Agreement, and thereafter Ms. Peirce only held transferee rights.[54]

33.    Defendants contend that the 2020 actions terminated only Ms. Peirce's employment, not her membership, and that Ms. Peirce remained a voting Member until Nurse Source paid the NPP under the Settlement Agreement.[55]

34.    The Operating Agreement provides that it "shall be interpreted in accordance with the laws of the State of Connecticut."[56] Under Connecticut law,

---

[52] Mem. Supp. Pl.'s MSJ 9–17.

[53] Br. Supp. Defs.' MSJ 4–10.

[54] Mem. Supp. Pl.'s MSJ 13–17.

[55] Defs.' Opp'n Pl.'s Mot. Partial Summ. J. [hereinafter, "Opp'n Pl.'s MSJ"] 11–14, ECF No. 121.

[56] Operating Agreement § 14.6.

interpretation of an LLC operating agreement is ordinarily a question of contract interpretation that turns on the parties' intent. *Rubin v. Brodie*, 228 Conn. App. 617, 648 (2024) (citing *Fischer v. People's United Bank, N.A.*, 216 Conn. App. 426, 438 (2022)). "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used . . . . The words used by the parties must be accorded their common meaning and usage where they can be sensibly applied to the subject matter of the contract . . . ." *Radding v. Freedom Choice Mortg., LLC*, 76 Conn. App. 366, 370 (2003) (citing *Anderson v. Pension & Retirement Board*, 167 Conn. 352, 354–56 (1974)).

35.     Whether contractual language is ambiguous presents a question of law for the Court. *Clinton v. Aspinwall*, 352 Conn. 597, 619 (2025). "A contract is unambiguous when its language is clear and conveys a definite and precise intent." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 102–03 (2014). "[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Id.* at 103.

36.     Sections 5.4(c) and 11.14 of the Operating Agreement address related but distinct subjects. Section 5.4(c) requires a two-thirds vote for the "[t]ermination of any Member for Cause."[57] The provision does not refer to employment. Section 11.14,

---

[57] Operating Agreement § 5.4(c).

in contrast, applies when the Company terminates a Member's employment for Cause, in which case, it affords Nurse Source and the remaining Members an option to acquire the affected Member's Units at fifty percent of Appraised Value.[58]

37.    Section 11.14(c) defines "Cause" expressly "[f]or purposes of this Section 11.14."[59]  The Operating Agreement contains no cross-reference incorporating that definition into Section 5.4(c), and Section 11.14 does not purport to limit Section 5.4(c)'s reference to the termination of "any Member."

38.    The Court therefore concludes that Section 5.4(c) independently authorizes the termination of a Member for Cause upon the requisite two-thirds vote.  Reading Section 5.4(c) to apply only to a termination of employment would add language the parties did not include and would fail to give independent effect to its reference to the termination of "any Member."  Section 11.14 does not alter that conclusion.  Rather, it provides a separate employment-related purchase mechanism that may follow termination of a Member's employment for Cause.  The purchase option created by Section 11.14 does not define whether a Member has been terminated under Section 5.4(c), and it does not state that a completed purchase is a prerequisite to a valid termination of membership.

39.    This interpretation conforms with the Connecticut Uniform Limited Liability Company Act.  A person is dissociated as a member when, among other events, an event specified in the operating agreement as causing dissociation occurs

---

[58] Operating Agreement § 11.14.

[59] Operating Agreement § 11.14(c).

or the person is expelled as a member pursuant to the operating agreement. Conn. Gen. Stat. § 34-263a(2)–(3). Dissociation terminates a person's right to participate in the management and conduct of the LLC's activities and affairs, and the person's transferable interest is thereafter held solely as a transferee. Conn. Gen. Stat. § 34-263b(a).

40.     The undisputed record shows that, on 26 June 2020, Ms. Vincelette and Ms. Court took action concerning the Peirces' employment and Ms. Peirce's management role.[60]  The June 26 minutes, however, do not cite Section 5.4, do not state that Ms. Peirce was terminated as a Member, or expelled, or dissociated from Nurse Source.[61]  The 23 September 2020 notice expressly invoked Section 11.14, stated that Nurse Source had terminated Ms. Peirce's employment for Cause, and gave notice of the exercise of the option to purchase Ms. Peirce's Units.[62]  Likewise, the 29 October 2020 Written Consent expressly addressed the termination of Ms. Peirce's employment for Cause pursuant to Section 11.14.[63]

41.     The Court concludes that neither the June 2020 action, the September 2020 notice, nor the 29 October 2020 Written Consent terminated Ms. Peirce's membership

---

[60] Am. Compl., Ex. A.  The June 26 minutes state that the Peirces would be terminated for Cause and that Ms. Peirce would be "immediately removed as a shareholder" and "prohibited from taking any further actions as a Manager of the company."  The June 26 minutes also state that, within ninety days of Peirce's termination, Ms. Vincelette would determine whether to exercise the right to purchase Ms. Peirce's interest pursuant to the Operating Agreement.

[61] Am. Compl., Ex. A; see also Operating Agreement § 15.1.  Definition of "Member."

[62] Am. Compl., Ex. B.

[63] Am. Compl., Ex. C.

in Nurse Source. These documents did not invoke Section 5.4(c), state that Ms. Peirce's membership was terminated, or declare that she was expelled or dissociated from Nurse Source.[64] An action need not cite a particular contractual provision to be effective. *See Zullo v. Smith*, 179 Conn. 596, 603–05 (1980); *Viking Construction, Inc. v. TMP Construction Group, LLC*, 338 Conn. 361, 373–74 (2021). But when all of the relevant documents characterize the action taken as an employment termination under Section 11.14 and the exercise of an option to purchase Units, which never took place, the Court cannot reasonably construe those documents as also effecting a separate termination of membership under Section 5.4(c).

42. The June 26 minutes state that Ms. Peirce would be "immediately removed as a shareholder" and prohibited from taking further action as a Manager.[65] That language provides some evidence that Ms. Vincelette and Ms. Court intended to remove Ms. Peirce from the companies' governance structure. It does not, however, state that Ms. Peirce was terminated as a "Member," expelled, or dissociated from Nurse Source. This distinction is consequential. "Shareholder" is not a term used by the Operating Agreement to identify an owner of Nurse Source.[66] The Operating Agreement instead distinguishes among "Members," "Interests," and "Rights."[67] The

---

[64] Am. Compl. Exs. A, B, C.

[65] Am. Compl., Ex. A.

[66] Operating Agreement.

[67] Operating Agreement § 15.1.

June 26 Minutes do not objectively effect the separate contractual action required to terminate Ms. Peirce as a Nurse Source Member under Section 5.4(c).

43. The Settlement Agreement supports that Ms. Peirce was not later terminated as a Member of Nurse Source. The Settlement Agreement contemplated that, at Closing, Nurse Source would pay the NPP and Ms. Peirce would transfer her Units and withdraw and resign as a member, officer, employee, and agent of Nurse Source.[68] The Settlement Agreement was executed in January 2022 by Nurse Source, Wellspring Group, and the Peirces.[69] Its express terms demonstrate that the parties then understood Ms. Peirce to remain a Member whose withdrawal and resignation would occur only upon Nurse Source's payment of the full NPP. It is undisputed that Nurse Source never made that payment.

44. Accordingly, Ms. Peirce remained a Member of Nurse Source and retained the voting and management rights under the Connecticut Uniform Limited Liability Company Act when the 5 June 2023 Written Consent was executed. Ms. Court and Ms. Peirce, as Members, had authority to employ or engage persons, including a Member, for the operation of Nurse Source.[70] Ms. Court and Ms. Peirce collectively held a 66.67% Voting Percentage when they executed the 5 June 2023 Written Consent. Plaintiff identifies no provision of the Operating Agreement requiring

---

[68] Settlement Agreement § 3(a), (d).

[69] Settlement Agreement.

[70] Operating Agreement §§ 5.1(b)(vii), 5.4; Operating Agreement Schedule A; Am. Compl., Ex. M.

unanimous consent to employ or reemploy a person who is a Member. The 5 June 2023 Written Consent was therefore valid.

45. Plaintiff's remaining request that Ms. Peirce and her husband Jamie Peirce reimburse Nurse Source for all salary, benefits, and other compensation received after the purported reinstatement likewise fails. That request is premised on the contention that Ms. Peirce's reinstatement was invalid and that all resulting compensation was consequently unauthorized. Because the Court concludes that Ms. Peirce remained a Member and that the 5 June 2023 Written Consent was valid, Plaintiff is not entitled to a declaration requiring reimbursement of compensation paid after that date. Moreover, Jamie Peirce is not a party to this action. The Court therefore lacks a basis in this claim to order relief against him personally.

46. This ruling addresses only Plaintiff's request for reimbursement premised on the invalidity of the 5 June 2023 Written Consent and does not resolve whether compensation or benefits paid after that date may be recoverable as damages on any surviving fiduciary-duty theory.

47. Accordingly, Plaintiff's Amended Motion for Partial Summary Judgment is **DENIED** as to the First Derivative Cause of Action. Defendants' Motion for Partial Summary Judgment is **GRANTED** as to the remaining portions of that claim, which are **DISMISSED** with prejudice.

48. In light of this ruling, the Court need not reach the parties' additional arguments concerning quasi-estoppel, judicial estoppel, or the legal effect of later filings and statements concerning Ms. Peirce's membership status.

## B. Second Derivative Cause of Action

49.     Plaintiff alleges that Ms. Court and Ms. Peirce breached fiduciary duties owed to Nurse Source by, among other things, depriving Nurse Source of the rights and benefits of the Settlement Agreement, reinstating Ms. Peirce, and using Nurse Source funds to pay their personal attorneys' fees.[71]

50.     Defendants move for summary judgment on this claim.  They acknowledge that Ms. Court and Ms. Peirce owed fiduciary duties to Nurse Source but contend that Plaintiff cannot establish that either Defendant advanced a personal interest to Nurse Source's detriment, that Nurse Source sustained damages, or that any alleged damages were proximately caused by a fiduciary breach.[72]

51.     Connecticut law governs this derivative claim.[73]  Members of a member-managed limited liability company owe the company duties of loyalty and care.  Conn. Gen. Stat. § 34-255h(a).  The duty of loyalty includes refraining from dealing with the company on behalf of a person with an adverse interest and from the appropriation of a company opportunity.  Conn. Gen. Stat. § 34-255h(b).  The duty of care requires members to discharge the duties in good faith, with care, and in the best interest of the company.  Conn. Gen. Stat. § 34-255h(c).  The Operating Agreement similarly protects a Member from liability for acts or omissions undertaken in good faith and

---

[71] Am. Compl. ¶¶ 149–54.

[72] Br. Supp. Defs.' MSJ 10–15.

[73] Operating Agreement § 14.6.

within the Member's authority, except for gross negligence, willful misconduct, or breach of the Operating Agreement.[74]

52. As discussed above, Ms. Peirce remained a Member of Nurse Source and the 5 June 2023 Written Consent was valid. Plaintiff therefore cannot premise this claim solely on the proposition that Ms. Peirce's reemployment was unauthorized. That conclusion does not resolve whether Defendants used their control of Nurse Source in bad faith or for personal benefit in deciding not to perform the Settlement Agreement, in managing company assets, or in causing Nurse Source to advance litigation expenses.

53. First, Defendants argue that Ms. Court cannot be liable for Nurse Source's uncollected accounts receivable because Kelly Begue, as CFO, was responsible for collections.[75] Defendants rely on testimony that Ms. Vincelette attributed the issue largely to Begue, that Begue did not consider Ms. Court negligent, and that Ms. Vincelette could not identify a particular collection measure Ms. Court should have taken.[76]

54. Plaintiff responds that Ms. Court was Nurse Source's CEO and only employed managing Member and testified that she was responsible for ensuring that accounts receivable "got taken care of."[77] Plaintiff further offers evidence that Ms.

[74] Operating Agreement § 9.2.

[75] Br. Supp. Defs.' MSJ 10–11.

[76] Br. Supp. Defs.' MSJ 10–11.

[77] Opp'n Defs.' MSJ 10; Opp'n Defs.' MSJ, Ex. 6 138:15–19, 192:2–193:23, ECF No. 125.2.

Court was not consistently communicating with Begue while receivables accrued, that Begue remained employed for months after Ms. Vincelette's removal, and that Ms. Court later retained her husband to collect receivables for a contingency fee.[78]

55. This evidence creates a genuine dispute regarding Ms. Court's responsibility for the collection efforts, the adequacy of her oversight, and whether any resulting loss was attributable to conduct outside the protection of Section 9.2 of the Operating Agreement.

56. Second, Defendants argue that Ms. Court did not breach her fiduciary duty by declining the proposed sale of Nurse Source.[79] They contend that Ms. Court rejected the transaction because of its terms, not because of a personal interest, and offered evidence that Ms. Vincelette herself considered the terms unfavorable.[80]

57. Plaintiff does not identify evidence in response to this argument from which a factfinder could conclude that Ms. Court rejected the proposed sale to advance a personal interest at Nurse Source's expense.[81]

58. Defendants are therefore entitled to summary judgment to the extent the Second Derivative Cause of Action rests on Ms. Court's refusal to sell Nurse Source.

59. Third, Defendants contend that Ms. Peirce's reemployment cannot support a fiduciary-duty claim because no evidence shows that Defendants advanced personal

---

[78] Opp'n Defs.' MSJ 10; Opp'n Defs.' MSJ, Ex. 6 96:17–21, 192:11–193:23; Opp'n Defs.' MSJ, Ex. 7 102:13–104:7, ECF Nos. 125.3 (redacted), 126.1 (sealed).

[79] Br. Supp. Defs.' MSJ 12.

[80] Br. Supp. Defs.' MSJ 12; Br. Supp. Defs.' MSJ, Ex. 9 131:1–133:2, ECF No. 171.10.

[81] *See generally* Opp'n Defs.' MSJ 9–12.

interests to Nurse Source's detriment or that Ms. Peirce's employment injured Nurse Source.[82]

60.    Plaintiff responds that Ms. Peirce regained employment and Ms. Court gained assistance in operating Nurse Source.[83]  Plaintiff further argues that whether rehiring Ms. Peirce, after her prior termination for Cause, damaged the company is a question for the factfinder.[84]

61.    The Court has concluded that Ms. Peirce remained a Member and that the 5 June 2023 Written Consent authorized her employment or reemployment with Nurse Source.  That conclusion does not resolve whether the reemployment decision was made in good faith and in Nurse Source's interests.  There is a genuine dispute of material fact whether the decision benefited or injured Nurse Source.  Summary judgment is therefore unwarranted on this theory.

62.    Fourth, Defendants argue that they did not cause Nurse Source's nonperformance under the Settlement Agreement.[85]  They contend that Nurse Source lacked funds for the first payment due in February 2023, Ms. Vincelette declined to facilitate an intercompany transfer, and Ms. Court never instructed Begue

---

[82] Br. Supp. Defs.' MSJ 12.

[83] Opp'n Defs.' MSJ 12.

[84] Opp'n Defs.' MSJ 12.  Plaintiff has not proffered evidence showing Ms. Peirce admitted to such wrongdoing.  The parties do not dispute that Ms. Peirce's employment was terminated for Cause.

[85] Br. Supp. Defs.' MSJ 12–14.

not to make payment.[86] Defendants further assert that retaining Ms. Peirce as a Member benefited Nurse Source.[87]

63.	Plaintiff responds with evidence that Nurse Source had funds available by the August 2023 closing date, including funds available to purchase Vincelette's interest and ERC funds received during the second half of 2023.[88] Plaintiff further argues that Nurse Source lost the opportunity to acquire Ms. Peirce's Units at a significant discount.[89]

64.	This evidence on the record permits competing inferences regarding Nurse Source's ability to perform, the reasons the Settlement Agreement was not performed, and whether Ms. Court and Ms. Peirce acted to retain personal benefits rather than to advance Nurse Source's interests. There is a genuine dispute of material fact as to whether failure to perform under the Settlement Agreement damaged Nurse Source. Therefore, Defendants are not entitled to summary judgment on this theory.

65.	Lastly, Defendants argue that Nurse Source only advanced their litigation expenses under Section 9.4 of the Operating Agreement, and no unauthorized personal attorneys' fees were paid.[90]

---

[86] Br. Supp. Defs.' MSJ 12–14.

[87] Br. Supp. Defs.' MSJ 13–14.

[88] Opp'n Defs.' MSJ 11–14; Am. Compl., Ex. E, ECF Nos. 53.5 (redacted), 55.2 (sealed); Am. Compl., Ex. O; Opp'n Defs.' MSJ, Ex. 7 46:18–47:5, 188:15–17; Opp'n Defs.' MSJ, Ex. 9 89:2–15, 90:2–11, ECF No. 125.5.

[89] Opp'n Defs.' MSJ 11.

[90] Br. Supp. Defs.' MSJ 14–15; Operating Agreement § 9.4.

66. Plaintiff responds that Section 9.4 authorizes advancement only upon Nurse Source's receipt of an undertaking, and that Ms. Peirce and Ms. Court had not provided such an undertaking when the expenses were advanced.[91]

67. Defendants reply that Ms. Court's and Ms. Peirce's subsequent declarations undertaking to reimburse Nurse Source render any dispute moot.[92]

68. The later declarations do not establish as a matter of law that Nurse Source received the required undertakings before the challenged advances. Whether Defendants caused Nurse Source to advance litigation expenses without satisfying Section 9.4's condition and whether Nurse Source sustained resulting injury remain disputed.

69. Accordingly, Defendants' Motion for Partial Summary Judgment is **GRANTED** to the limited extent Plaintiff's Second Derivative Cause of Action rests on Ms. Court's refusal to sell Nurse Source. The Motion is otherwise **DENIED** as to Plaintiff's Second Derivative Cause of Action for Breach of Fiduciary Duty.

C. **Third Derivative Cause of Action**

70. Plaintiff's remaining Third Derivative Cause of Action alleges that Ms. Peirce breached the Settlement Agreement by failing to assign, transfer, convey, and deliver her Nurse Source Units.[93]

---

[91] Opp'n Defs.' MSJ 10–11.

[92] Defs.' Reply Supp. Mot. Partial Summ. J. [hereinafter, "Reply Supp. Defs.' MSJ"] 5–6, ECF No. 132.

[93] Am. Compl. ¶¶ 155–61; Mot. Dismiss Order.

71.     To prevail on a breach-of-contract claim under Connecticut law, Plaintiff must establish the agreement, performance by Nurse Source, breach by Ms. Peirce, and resulting damages. *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133 (2017). One cannot recover upon a contract unless he has fully performed his own obligation under it, has tendered performance, or has some legal excuse for not performing. *Automobile Ins. Co. v. Model Family Laundries*, 133 Conn. 433, 437 (1947).

72.     Defendants contend that Nurse Source's payment of the NPP was a condition precedent to Ms. Peirce's obligation to transfer her Units.[94] Because Nurse Source never paid Ms. Peirce the NPP, Defendants argue that Ms. Peirce's duty to transfer never arose.[95]

73.     Plaintiff responds that the parties' obligations were concurrent and contends that Nurse Source was required to pay the NPP while Ms. Peirce was required to deliver her Units and resign from Nurse Source at Closing.[96] Plaintiff further argues that Ms. Peirce's reemployment and participation in the 5 June 2023 Written Consent suggest that Ms. Peirce no longer intended to complete the transaction.[97]

74.     A condition precedent is an event the parties intended to occur before a right to performance arises. *Lach v. Cahill*, 138 Conn. 418, 421 (1951). Whether a

---

[94] Br. Supp. Defs.' MSJ 14–15.

[95] Br. Supp. Defs.' MSJ 14–15.

[96] Opp'n Defs.' MSJ 12–13.

[97] Opp'n Defs.' MSJ 12–13.

contractual performance is a condition precedent depends on the parties' intent as expressed in the agreement and the surrounding circumstances. *Christophersen v. Blount*, 216 Conn. 509, 512 (1990). Conversely, when the promised performances may be rendered simultaneously, they ordinarily are due simultaneously unless the agreement or circumstances indicate otherwise. *Pullman, Comley, Bradley & Reeves v. Tuck-it-away, Bridgeport, Inc.*, 28 Conn. App. 460, 467 (1992).

75. The Settlement Agreement establishes concurrent obligations at Closing. Section 3(a) of the Settlement Agreement requires Ms. Peirce to transfer her Units "[i]n consideration of the Purchase Price" and provides that her withdrawal and resignation would become effective at Closing.[98] Section 3(e) then requires Nurse Source and Ms. Peirce, "[a]t the Closing," to deliver the required cash payment and the instruments necessary to transfer Ms. Peirce's Units.[99] The Agreement thus contemplates a reciprocal exchange at Closing, rather than a requirement that Nurse Source first complete payment before Ms. Peirce had any obligation to participate in the transfer.

76. That conclusion, however, does not establish a breach by Ms. Peirce. For mutual and dependent promises to be performed concurrently, the party seeking relief must show readiness, willingness, and ability to perform, together with notice to the other party of that readiness, or sufficient excuse for the absence of such a

---

[98] Settlement Agreement §§ 1, 3(a), (e).

[99] Settlement Agreement §§ 1, 3(a), (e).

tender.  *See Smith v. Lewis*, 26 Conn. 110, 118 (1857); *Lunde v. Minch*, 105 Conn. 657, 659 (1927); *Fed. Fin. Co. v. Forman Props., Inc.*, 135 Conn. 153, 156–57 (1948).

77.    It is undisputed that Nurse Source never paid or tendered the NPP.  Plaintiff relies on evidence that Nurse Source may have possessed funds by August 2023 and that Ms. Vincelette demanded that Nurse Source make the required payment.[100] That evidence does not show that Nurse Source tendered payment, notified Ms. Peirce that it was then ready, willing, and able to complete the exchange, or otherwise placed Ms. Peirce in default.

78.    Plaintiff likewise has not presented evidence that Ms. Peirce refused a tender, was unable to convey her Units, or unequivocally repudiated the Settlement Agreement.  "Repudiation can occur either by a statement that the promisor will not perform or by a voluntary, affirmative act that indicates inability, or apparent inability, substantially to perform." *Gilman v. Pedersen*, 182 Conn. 582, 584 (1981).

79.    Ms. Peirce's participation in the 5 June 2023 Written Consent does not constitute such a repudiation.  Her reemployment was not incompatible with an obligation to transfer the Units and resign at a future Closing.  Nor does Plaintiff identify any statement by Ms. Peirce that she would refuse a concurrent tender.

80.    Accordingly, there is no genuine dispute of material fact as to whether Ms. Peirce breached the Settlement Agreement.  Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Plaintiff's remaining Third Derivative Cause of Action for Breach of Contract against Ms. Peirce, which is **DISMISSED** with prejudice.

---

[100] Opp'n Defs.' MSJ 12–14.

## D. Fourth Derivative Cause of Action

81.     Plaintiff's remaining Fourth Derivative Cause of Action seeks specific performance of the Settlement Agreement, requesting an order requiring Ms. Peirce to complete the contemplated transaction by transferring her Units.[101]

82.     Specific performance is an equitable remedy that depends on the existence of an enforceable contractual obligation. *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981). The Court has granted Defendants' Motion for Partial Summary Judgment on Plaintiff's remaining Third Derivative Cause of Action for breach of the Settlement Agreement. Plaintiff therefore has no remaining contract claim upon which to predicate specific performance.

83.     Plaintiff identifies no independent basis to compel Ms. Peirce to perform the Settlement Agreement. Accordingly, Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Plaintiff's Fourth Derivative Cause of Action for Specific Performance, which is **DISMISSED** with prejudice.

## E. Fifth Derivative Cause of Action

84.     Plaintiff alleges that Ms. Court and Ms. Peirce agreed to deprive Nurse Source of the rights and benefits contemplated by the Settlement Agreement and took acts in furtherance of that agreement.[102]

85.     It is well established that "there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690 (2005).

---

[101] Am. Compl. ¶¶ 162–66; Mot. Dismiss Order.

[102] Am. Compl. ¶¶ 167–71.

Rather, "civil conspiracy is premised on the underlying act." *Piraino Bros., LLC v. Atl. Fin. Group, Inc.*, 211 N.C. App. 343, 350 (2011). To establish a claim for civil conspiracy, a plaintiff must allege: "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Krawiec v. Manly*, 370 N.C. 602, 614 (2018). A conspiracy requires an agreement between at least two people to take an unlawful action or to take a lawful action in an unlawful manner. *See id.* at 613; *Evans v. Star GMC Sales & Serv., Inc.*, 268 N.C. 544, 546 (1966). "[S]ufficient evidence of the agreement must exist to create more than a suspicion or conjecture." *BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 300 (2019) (internal quotations omitted).

86. The Court's conclusions above have narrowed Plaintiff's claim. Plaintiff may not predicate civil conspiracy on Ms. Peirce's alleged breach of the Settlement Agreement. Nor may Plaintiff rely on the 5 June 2023 Written Consent as an independently wrongful act, because the Court has concluded that Ms. Peirce remained a Member and that the 5 June 2023 Written Consent was validly adopted.

87. Those conclusions do not, however, dispose of the claim to the extent it rests on Plaintiff's surviving derivative claim for breach of fiduciary duty. The Court has determined that genuine disputes of material fact remain as to whether Ms. Court and Ms. Peirce used their control of Nurse Source in a manner that breached duties owed to the Company. A civil-conspiracy claim may proceed on that alleged underlying wrongdoing even though the same conduct did not establish a contractual breach by Ms. Peirce.

88. Defendants argue that Plaintiff failed to prove that Nurse Source was injured by its failure to pay the NPP and that causing such nonpayment is not an unlawful act.[103] Defendants further contend that Plaintiff presented no evidence to support her civil conspiracy claim to the extent that it is not based on Nurse Source's nonpayment of the NPP.[104]

89. Plaintiff argues that the conspiracy claim is supported by both the surviving fiduciary-duty claim and an alleged agreement to cause Nurse Source not to perform the Settlement Agreement.[105] Plaintiff principally relies on Ms. Court's November 2022 email to Ms. Vincelette, copied to Ms. Peirce, stating that Ms. Court was "pulling the settlement agreement," preferred Ms. Peirce as a business partner, and expected Ms. Vincelette would "lose it all";[106] nonpayment on the February 2023 deadline under the Settlement Agreement; Ms. Court's and Ms. Peirce's joint execution of the 5 June 2023 Written Consent; Ms. Court's and Ms. Peirce's alleged participation in the write-off of a substantial receivable owed to Wellspring Group after Ms. Peirce returned to the Company;[107] and Ms. Court's and Ms. Peirce's joint execution of the 7 August 2023 Written Consent concerning Ms. Vincelette's employment and Units.

---

[103] Br. Supp. Defs.' MSJ 17–18.

[104] Br. Supp. Defs.' MSJ 18.

[105] Opp'n Defs.' MSJ 15–17.

[106] Am. Compl., Ex. R; Opp'n Defs.' MSJ, Ex. 6 137:19–146:4.

[107] Opp'n Defs.' MSJ 5 & n.21; Opp'n Defs.' MSJ, Ex. 7 97:25–98:13.

Plaintiff further contends that Nurse Source's injury was the loss of opportunity to purchase Ms. Peirce's Units at a significant discount.[108]

90.   Taken together, the evidence is sufficient to create genuine disputes as to the existence of an agreement, the commission of wrongful acts in furtherance of that agreement and resulting injury to Nurse Source.  The Court considers this evidence only as evidence of an alleged fiduciary breach and related conspiracy, not as evidence that Ms. Peirce herself breached the Settlement Agreement.

91.   Accordingly, Defendants' Motion for Partial Summary Judgment is **GRANTED** only to the extent Plaintiff predicates the Fifth Derivative Cause of Action on Ms. Peirce's alleged breach of the Settlement Agreement or the purported invalidity of the 5 June 2023 Written Consent.  Defendants' Motion is otherwise **DENIED** as to Plaintiff's Fifth Derivative Cause of Action for Civil Conspiracy.

F.  **First Individual Cause of Action**

92.   Two components of the First Individual Cause of Action remain: (a) whether Ms. Vincelette was ever employed by Nurse Source, and (b) whether Ms. Peirce could validly vote on the 7 August 2023 Written Consent concerning Ms. Vincelette's termination.[109]

---

[108] Opp'n Defs.' MSJ 16.

[109] Am. Compl. ¶¶ 172–74; Mot. Dismiss Order. ¶¶ 75(d), (i).

93.    Plaintiff seeks partial summary judgment on both components,[110] while Defendants seek summary judgment only as to Ms. Peirce's authority to vote.[111]

94.    The parties agree, and Defendants concede that Nurse Source did not employ Ms. Vincelette.[112] The Court therefore concludes that no genuine dispute of material fact exists as to that issue.

95.    The parties dispute whether Ms. Peirce could vote on the 7 August 2023 Written Consent.

96.    As discussed above, the Court has concluded that Ms. Peirce remained a Member of Nurse Source through August 2023. Ms. Peirce therefore retained the voting rights associated with her membership.

97.    Section 5.4(c) of the Operating Agreement authorizes the termination of a Member for Cause upon affirmative vote of two-thirds of the Members represented in Person or by proxy at a duly held meeting".[113] At the time of the 7 August 2023 Written Consent, Nurse Source had three Members: Ms. Vincelette, Ms. Court, and Ms. Peirce. Ms. Court (who owned 33.33% of the Units) and Ms. Peirce (who owned 33.34% of the Units) therefore constituted two-thirds of the Members and possessed

---

[110] Mem. Supp. Pl.'s MSJ 9–17.

[111] Br. Supp. Defs.' MSJ 18–19.

[112] Opp'n Pl.'s MSJ 7.

[113] Operating Agreement § 5.4(c); Operating Agreement Schedule A; Am. Compl., Ex. O. The 7 August 2023 Written Consent specifically referenced Section 5.4(c) of the Operating Agreement.

sufficient authority under Section 5.4(c) to act. Ms. Peirce could validly vote on the 7 August 2023 Written Consent.

98. This ruling addresses only Ms. Peirce's authority to participate in the vote. It does not determine whether Cause existed, whether the 7 August 2023 Written Consent otherwise had legal effect, or whether its execution gives rise to liability under any surviving claim.

99. Accordingly, Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to the declaration that Ms. Vincelette was not employed by Nurse Source and **DENIED** as to Ms. Peirce's voting authority. Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Ms. Peirce's authority to vote on the 7 August 2023 Written Consent.

## G. Second Individual Cause of Action

100. Plaintiff's Second Individual Cause of Action alleges that Ms. Court and Ms. Peirce breached the Operating Agreement by purporting to terminate Ms. Vincelette's employment for Cause and to exercise a right to purchase Ms. Vincelette's Units at fifty percent of their Appraised Value.[114]

101. The Operating Agreement is a valid contract governed by Connecticut law.

102. Plaintiff contends that the 7 August 2023 Written Consent was ineffective because Nurse Source did not employ her and because Ms. Peirce lacked authority to vote. Plaintiff further contends that the Operating Agreement did not permit Ms.

---

[114] Am. Compl. ¶¶ 175–88.

Court and Ms. Peirce to invoke Section 11.14 to purchase her Units at fifty percent of their Appraised Value.[115]

103. Defendants respond that Section 5.4(c) independently authorized Ms. Court and Ms. Peirce to terminate Ms. Vincelette as a Member for Cause and that the 7 August 2023 Written Consent's reference to Section 11.14 provided notice of the ensuing purchase process.[116]

104. The Court's conclusions above resolve two of Plaintiff's arguments. First, Section 5.4(c) authorizes the termination of a Member for Cause independently of any employment relationship. Ms. Vincelette's undisputed status as a nonemployee therefore did not render her immune from termination as a Member under Section 5.4(c). Second, Ms. Peirce remained a Member in August 2023 and could validly participate in the 7 August 2023 Written Consent.

105. The 7 August 2023 Written Consent, read as a whole, invoked Section 5.4(c) and purported to take action by the requisite supermajority of Members. It states that the signatories acted "[p]ursuant to Sections 5.2, 5.4(c), and 11.14," identifies the action as a "TERMINATION OF AMY VINCELETTE FOR CAUSE," and recites that Ms. Court and Ms. Peirce constituted the requisite 66.67% voting percentage.[117] The reference in the operative resolution to terminating Ms. Vincelette's "employment"

---

[115] Mem. Supp. Pl.'s MSJ 9–17.

[116] Opp'n Pl.'s MSJ 5–17.

[117] Am. Compl., Ex. O.

does not, standing alone, eliminate the 7 August 2023 Written Consent's express invocation of Section 5.4(c) or the Members' authority to act under that provision.

106. Section 11.14(a) of the Operating Agreement grants the Company and remaining Members an option to purchase a Member's Units at a 50% discount "[i]n the event the Company terminates a Member's employment for Cause."[118] Section 11.14(c) further provides that its definition of Cause applies "[f]or purposes of this Section 11.14."[119] As the Court has concluded, Ms. Vincelette was not employed by Nurse Source. Section 11.14 therefore did not authorize Ms. Court and Ms. Peirce to invoke its discounted purchase option against Ms. Vincelette.

107. Defendants' contrary construction would extend Section 11.14 beyond its express employment-based condition and would treat the discounted purchase option as an automatic consequence of a termination under Section 5.4(c). The Operating Agreement does not contain language connecting those distinct provisions in that manner. Although Section 5.4(c) permits Members to terminate another Member for Cause, it does not itself incorporate the purchase option in Section 11.14.

108. These conclusions, however, do not establish that Ms. Court and Ms. Peirce breached the Operating Agreement by terminating Ms. Vincelette's membership. The validity of a termination under Section 5.4(c) turns on whether Cause existed. Plaintiff does not seek summary judgment on that question and acknowledges that

---

[118] Operating Agreement § 11.14(a).

[119] Operating Agreement § 11.14(c).

factual disputes remain regarding the alleged misconduct identified in the 7 August 2023 Written Consent.[120]

109. Because Plaintiff bears the burden on her affirmative motion and has not established the absence of a genuine dispute regarding Cause, she is not entitled to summary judgment that the 7 August 2023 Written Consent was invalid in its entirety or that Ms. Vincelette necessarily remained a Member after its execution.

110. Accordingly, Plaintiff's Motion for Partial Summary Judgment is **DENIED** as to the Second Individual Cause of Action.

## H. <u>Fourth Individual Cause of Action</u>

111. Plaintiff's Fourth Individual Cause of Action asserts that Nurse Source breached two alleged agreements with Wellspring Group: (1) an agreement to repay funds transferred from Wellspring Group to Nurse Source between late 2022 and February 2023; and (2) an agreement to pay Wellspring Group $72,500 as its alleged share of the $145,000 offset reflected in the Settlement Agreement.[121] Plaintiff brings these claims as Wellspring Group's assignee.[122]

112. Plaintiff seeks partial summary judgment on the first component of this claim, seeking recovery of $258,000 from Nurse Source arising from the intercompany transfers.[123] Plaintiff does not seek summary judgment at this point on the

---

[120] Mem. Supp. Pl.'s MSJ 10–11 & n.34.

[121] Am. Compl. ¶¶ 197–205.

[122] Am. Compl. ¶¶ 201–02.

[123] Mem. Supp. Pl.'s MSJ 8–9.

remaining $17,000 of the transferred funds or on any other amounts allegedly owed under this claim.[124]

113. The parties do not dispute that Wellspring Group transferred $275,000 to Nurse Source between November 2022 and February 2023. Nor do Defendants dispute that Nurse Source is obligated to repay at least $258,000 of those transfers after application of their asserted $17,000 offset. Indeed, Defendants consent to entry of judgment against Nurse Source in the principal amount of $258,000.[125] Plaintiff, as Wellspring Group's assignee, is therefore entitled to partial summary judgment against Nurse Source in the amount of $258,000, with post-judgment interest as provided by law.

114. Plaintiff also seeks prejudgment interest.[126] Under North Carolina law, which applies to this issue, prejudgment interest on a contract claim accrues from the date of breach. N.C. Gen. Stat. § 24-5(a). When a loan agreement does not specify a time for repayment, North Carolina law supplies a reasonable time for performance. *See Helms v. Prikopa*, 51 N.C. App. 50, 55–56 (1981) (holding that the law infers a reasonable time for performance in the context of loans without a specific time for repayment); *Winders v. Hill*, 141 N.C. 694, 704 (1906).

115. The existence of a repayment obligation does not, however, establish the date on which that obligation matured. The determination of a reasonable time for

---

[124] Mem. Supp. Pl.'s MSJ 8–9.

[125] Mem. Supp. Pl.'s MSJ 8–9; Opp'n Pl.'s MSJ 3.

[126] Mem. Supp. Pl.'s MSJ 8–9.

repayment requires consideration of the circumstances and purposes of the transaction and generally presents a mixed question of law and fact. *Helms*, 51 N.C. App. at 56–57; *Maxwell v. Michael P. Doyle, Inc.*, 164 N.C. App. 319, 326–27 (2004). It may be decided as a matter of law only when the material facts are undisputed and permit but one reasonable inference. *Harris v. Stewart*, 193 N.C. App. 142, 148 (2008).

116. Plaintiff contends that the final transfer occurred on 24 February 2023 and that she demanded immediate repayment on 30 August 2023.[127] Defendants contend that the parties did not agree upon repayment terms and rely on their October 2023 offer to repay $258,901.08.[128] The present record shows a genuine dispute of material fact as to whether the parties agreed that repayment was due immediately and, if not, when a reasonable time for repayment expired. Although Ms. Vincelette demanded repayment on 30 August 2023, the Court cannot determine on the present record whether that demand coincided with, or established, the date Nurse Source's repayment obligation became due.

117. Accordingly, Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to Nurse Source's liability for $258,000 in principal and otherwise **DENIED**.

118. Defendants seek summary judgment on the second component of Plaintiff's claim: the alleged agreement requiring Nurse Source to pay Wellspring Group

---

[127] Mem. Supp. Pl.'s MSJ 8–9; Am. Compl. ¶ 126; Pl.'s MSJ, Ex. 10, ECF No.130.1.

[128] Opp'n Pl.'s MSJ 3–5.

$72,500 as its share of the $145,000 offset provided in the Settlement Agreement. Defendants contend that no enforceable agreement was formed because Ms. Court rejected the proposal, the parties never executed the draft written consent, and material terms remained unresolved.[129]

119. Plaintiff responds that the record permits a finding that Nurse Source agreed to share the $145,000 offset equally with Wellspring Group.[130] Plaintiff relies on testimony from Ms. Vincelette and Mr. Vincelette, a 10 September 2021 email stating that Nurse Source would "split the $145,000 offset with Wellspring Group equally," and a later draft written consent reflecting a $72,500 payment obligation.[131] Plaintiff further contends that Ms. Court's objections to the proposed written consent concerned the proposed ownership arrangement rather than the $72,500 payment.[132]

120. The Court concludes that the record shows a genuine dispute of material fact concerning mutual assent to the alleged payment obligation.

121. Accordingly, Defendants' Motion for Partial Summary Judgment is **DENIED** to the extent it seeks dismissal of Plaintiff's claim for the alleged $72,500 payment.

---

[129] Br. Supp. Defs.' MSJ 19–20; Opp'n Defs.' MSJ, Ex. 8 96:20–22, ECF No. 125.4; Br. Supp. Defs.' MSJ, Ex. 21, ECF No. 117.22

[130] Opp'n Defs.' MSJ 17–19.

[131] Opp'n Defs.' MSJ 17–19; Opp'n Defs.' MSJ, Ex. 8 95:23–96:22; Br. Supp. Defs.' MSJ, Ex. 21.

[132] Opp'n Defs.' MSJ 18–19.

## I. Sixth Individual Cause of Action

122. Plaintiff's Sixth Individual Cause of Action alleges that Wellspring Group conferred non-gratuitous benefits on Nurse Source through: (a) the parties' mutual, running open account and related intercompany transactions; (b) separate transfers of funds to Nurse Source; and (c) Wellspring Group's entry into the Settlement Agreement in reliance on Nurse Source's alleged promise to pay Wellspring Group $72,500 as its share of the $145,000 offset.[133] Plaintiff asserts this claim as Wellspring Group's assignee.[134]

123. Defendants seek summary judgment on two grounds. First, Defendants contend that the three-year statute of limitations bars recovery under this claim for any intercompany transaction occurring before 16 April 2021; second, Defendants contend that Wellspring Group conferred no measurable benefit on Nurse Source through the Settlement Agreement or the alleged $72,500 arrangement.[135]

124. To establish unjust enrichment, Plaintiff must show that Wellspring Group conferred on Nurse Source a measurable benefit that Nurse Source accepted and that was conferred neither officiously nor gratuitously. *Du Plessis v. Du Plessis*, 298 N.C. App. 664, 669 (2025). A claim for unjust enrichment is subject to a three-year limitations period. N.C. Gen. Stat. § 1-52(1), (4); *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 85 (2011). An unjust-enrichment claim accrues when the defendant

---

[133] Am. Compl. ¶¶ 212–18.

[134] Am. Compl. ¶¶ 216–17.

[135] Br. Supp. Defs.' MSJ 20–21.

accepts the allegedly non-gratuitous benefit, not upon a later demand and refusal to pay. *See Stratton*, 211 N.C. App. at 85.

125. Defendants therefore contend that any claim based on an intercompany transaction occurring before 16 April 2021, three years before Plaintiff commenced this action, is untimely.[136]

126. The Court agrees. Plaintiff does not make an argument that would create a genuine dispute as to the accrual of the unjust enrichment claim for benefits conferred and accepted before 16 April 2021.[137] Instead, Plaintiff argues that amounts barred under this equitable theory may remain recoverable under her separate action on account claim.[138] That argument does not avoid the limitations bar as to this claim. Defendants are therefore entitled to summary judgment to the extent Plaintiff seeks unjust enrichment recovery for benefits conferred and accepted before 16 April 2021.

127. Defendants next contend that Plaintiff cannot establish unjust enrichment based on Wellspring Group's entry into the Settlement Agreement. They argue that Wellspring Group and Nurse Source were merely co-plaintiffs in the prior litigation, that the $145,000 offset applied only to the NPP otherwise owed by Nurse Source to

---

[136] Br. Supp. Defs.' MSJ 20–21.

[137] Opp'n Defs.' MSJ 19–20.

[138] Opp'n Defs.' MSJ 19–20.

Ms. Peirce, and that Wellspring Group's asserted $72,500 interest would impose a liability on Nurse Source rather than reflect a benefit conferred upon it.[139]

128. Plaintiff responds that the Settlement Agreement was a global resolution that benefited Nurse Source beyond the claims Nurse Source and Wellspring Group had asserted against the Peirces.[140] Plaintiff contends that Nurse Source was also a counterclaim defendant in the prior litigation and that the Settlement Agreement resolved the Peirces' counterclaims against Nurse Source.[141] Plaintiff further contends that the $145,000 offset reflected alleged wrongdoing that affected both Wellspring Group and Nurse Source, such that Nurse Source received a larger reduction in the NPP than it otherwise would have received absent Wellspring Group's participation and claims.[142]

129. The Court concludes that genuine issues of material fact exist as to whether Nurse Source in fact received such a benefit, whether it accepted that benefit, and whether retention of the benefit without payment would be inequitable. The Court therefore cannot enter summary judgment in Defendants' favor on the $72,500 component of Plaintiff's unjust enrichment claim.

130. Accordingly, Defendants' Motion for Partial Summary Judgment is **GRANTED** to the extent Plaintiff seeks recovery under the Sixth Individual Cause

---

[139] Br. Supp. Defs.' MSJ 21.

[140] Opp'n Defs.' MSJ 20–21; Settlement Agreement.

[141] Opp'n Defs.' MSJ 20–21.

[142] Opp'n Defs.' MSJ 20–21.

of Action for benefits conferred and accepted before 16 April 2021. Defendants'
Motion is otherwise **DENIED**.

## J. Eighth Individual Cause of Action

131. Plaintiff's Eighth Individual Cause of Action alleges that Nurse Source
breached the Operating Agreement by refusing to indemnify Plaintiff and advance
her expenses incurred in this action.[143] Both Plaintiff and Defendants seek summary
judgment on this claim.

132. Plaintiff contends that Section 9.4 requires Nurse Source to advance her
litigation expenses because the 7 August 2023 Written Consent constituted a "claim,
demand, action, suit or proceeding" that she has been required to defend.[144] Plaintiff
asserts that this litigation seeks, in part, to defend against the purported termination
of her membership interest.[145]

133. Defendants respond that Section 9.4 concerns expenses incurred in
defending an adverse claim or proceeding, not expenses incurred by a Member who
initiates affirmative litigation against the Company and other Members.[146]

134. The relevant facts are not disputed. Plaintiff commenced this action and
sought affirmative declaratory, contractual, derivative, and other relief. No

---

[143] Am. Compl. ¶¶ 225–38.

[144] Mem. Supp. Pl.'s MSJ 17–20.

[145] Mem. Supp. Pl.'s MSJ 17–20.

[146] Opp'n Pl.'s MSJ 17–18.

Defendant asserted a counterclaim or other claim against Plaintiff in this action. The issue is therefore one of contract interpretation.

135. Whether contractual language is ambiguous presents a question of law for the Court. *Clinton v. Aspinwall*, 352 Conn. 597, 619 (2025). "A contract is unambiguous when its language is clear and conveys a definite and precise intent." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 102–03 (2014). "[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Id*. at 103. The fact that the parties advance competing interpretations does not itself create ambiguity. *Id*.

136. Section 9.3 of the Operating Agreement provides:

> Indemnification. To the fullest extent permitted by applicable law, the Company shall indemnify any Member for any loss, damage or claim incurred by such Member ***by reason of any act or omission performed or omitted by such Member in good faith on behalf of the Company*** and in a manner reasonably believed to be within the scope of authority conferred on such Member by this Agreement.[147]

Section 9.4 of the Operating Agreement relatedly provides:

> Expenses. To the fullest extent permitted by applicable law, the expenses (including legal fees) incurred by any Member in ***defending any claim, demand, action, suit or proceeding*** shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding including claims, demands, actions, suits or proceedings with respect to which such Member is alleged to have not met the applicable standard of conduct or is alleged to have committed conduct so that, if true, such Member would not be entitled to indemnification under this Agreement, upon receipt by the Company of an undertaking by or on behalf of such Member to repay such amount if

---

[147] Operating Agreement § 9.3 (emphasis added).

it shall be determined that such Member is not entitled to be indemnified as authorized in Section 9.3 hereof.[148]

137. Sections 9.3 and 9.4 are unambiguous and serve distinct functions. Section 9.3 governs Plaintiff's ultimate right to indemnification and conditions that right on the nature of the Member's conduct. Section 9.4 creates a conditional right to the interim advancement of expenses incurred in defending a qualifying matter, subject to the Member's undertaking to repay advanced amounts if she is ultimately determined not to be entitled to indemnification under Section 9.3. Section 9.4's repayment mechanism confirms that advancement does not resolve the separate question of whether ultimate indemnification is warranted.

138. The threshold requirement under Section 9.4 is that the Member incurred expenses "in defending any claim, demand, action, suit or proceeding." Read as a whole, this phrase describes an adverse matter directed against the Member. The terms "defending" and "final disposition," together with the associated terms "claim," "demand," "suit," and "proceeding," confirm that "action" in this provision refers to an adversarial matter requiring a defense, not every internal corporate act that may adversely affect a Member. *See Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Development, LLC*, 273 Conn. 724, 740 (2005) ("Where a provision contains two or more words grouped together, we often examine a particular word's relationship to the associated words and phrases to determine its meaning pursuant to the canon of construction *noscitur a sociis*.").

---

[148] Operating Agreement § 9.4 (emphasis added).

139. Plaintiff's contrary construction is not reasonable in context. Although the Operating Agreement elsewhere uses "action" to describe Member or Company action, Section 9.4 does not use that term in isolation. Construing the provision to encompass any adverse written consent or other governance act would require Nurse Source to finance affirmative litigation whenever a Member challenged a Company decision. Nothing in the language of Sections 9.3 or 9.4 supports that result.

140. The 7 August 2023 Written Consent was a corporate act concerning Plaintiff's membership and alleged conduct. It did not commence a claim, demand, action, suit, or proceeding that Plaintiff was required to defend within the meaning of Section 9.4. Plaintiff instead initiated this litigation to challenge the 7 August 2023 Written Consent and pursue affirmative relief. The fact that some of Plaintiff's claims seek to negate the consequences of the 7 August 2023 Written Consent does not transform this plaintiff-initiated action into a qualifying defensive matter.

141. Plaintiff's reliance on *Vanguard Pai Lung, LLC v. Moody*, 2020 NCBC LEXIS 92 (N.C. Super. Ct. Aug. 4, 2020) is misplaced. In *Moody*, this Court held that counterclaims that are "truly defensive in character" are treated as "defending" an action for purposes of a right of advancement. *See Moody*, at *15–18. Plaintiff did not assert responsive counterclaims after being sued or otherwise made the subject of an adversarial proceeding. She commenced this action in the first instance.

142. Because the expenses for which Plaintiff seeks advancement were not incurred in defending a qualifying matter under Section 9.4, Plaintiff is not entitled to advancement. Any request for present indemnification under Section 9.3 also fails.

Whether Plaintiff may ultimately be entitled to indemnification depends on conditions not resolved in this action, and Section 9.3 does not create an immediate right to litigation-expense advancement independent of Section 9.4.

143. Accordingly, Plaintiff's Motion is **DENIED** as to the Eighth Individual Cause of Action. Defendants' Motion is **GRANTED** as to Plaintiff's request for advancement or indemnification of expenses incurred in prosecuting this action, and the Eighth Individual Cause is **DISMISSED** with prejudice as pleaded. This ruling does not adjudicate any future indemnification request arising from a qualifying claim, demand, action, suit, or proceeding after the conditions for indemnification have been satisfied.

## K. Ninth Individual Cause of Action

144. Plaintiff's Ninth Individual Cause of Action alleges that Ms. Court and Ms. Peirce breached fiduciary duties owed directly to Ms. Vincelette by advancing their own interests to her detriment.[149] Defendants move for summary judgment on this claim.

145. Connecticut law governs Plaintiff's direct fiduciary-duty claim. Members of a member-managed limited liability company owe the other Members duties of loyalty and care. Conn. Gen. Stat. § 34-255h(a). A Member may maintain a direct action against another Member to enforce her rights or protect her interests, but she must prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company. Conn. Gen.

---

[149] Am. Compl. ¶¶ 239–43.

Stat. § 34-271(a)–(b). To prevail, Plaintiff must establish that a fiduciary relationship existed, that Defendants advanced their own interests to her detriment, and that Plaintiff sustained damages proximately caused by the breach. *Chioffi v. Martin*, 181 Conn. App. 111, 138 (2018) (quoting *Rendahl v. Peluso*, 173 Conn. App. 66, 100 (2017)).

146. Defendants contend that Plaintiff may not pursue an individual claim based on alleged mismanagement of Nurse Source because any injury from that conduct belongs to Nurse Source and must be pursued derivatively.[150] Defendants further contend that Plaintiff's allegations concerning the attempted termination of her interest sound only in contract and are barred by the economic-loss doctrine.[151]

147. The Court agrees that Plaintiff may not recover individually for injuries suffered solely by Nurse Source. To the extent Plaintiff's Ninth Individual Cause of Action rests on alleged mismanagement of Nurse Source's operations, accounts receivable, assets, or contractual opportunities, the asserted injury is to Nurse Source and must be pursued, if at all, through Plaintiff's derivative claims. *See* Conn. Gen. Stat. § 34-271(b).

148. Plaintiff's remaining theories, however, concern alleged injuries personal to her as a Member. Plaintiff contends that Ms. Court and Ms. Peirce sought to deprive her of her Membership Interest through the 7 August 2023 Written Consent and the

---

[150] Br. Supp. Defs.' MSJ 24–25.

[151] Br. Supp. Defs.' MSJ 25–26.

attempted purchase of her Units at fifty percent of Appraised Value.[152]  Plaintiff also

relies on allegations, incorporated into this claim, that Defendants withheld financial

information and records to which she was entitled as a Member.[153]  These alleged

injuries are not merely derivative of an injury to Nurse Source.

149.  The Court's preceding rulings do not eliminate these direct theories.

Although Ms. Peirce was authorized to vote on the 7 August 2023 Written Consent

and Section 5.4(c) permits the termination of a Member for Cause, genuine issues

remain as to whether Cause existed.  Further, the Court has concluded that Section

11.14 did not authorize the attempted discounted purchase of Ms. Vincelette's Units

because she was not a Nurse Source employee.  The present record shows a genuine

dispute as to whether Ms. Court and Ms. Peirce used their control of Nurse Source to

advance their own interests at Ms. Vincelette's expense.

150.  Defendants' economic-loss argument does not require a different result.

Connecticut's economic-loss doctrine bars negligence claims for commercial losses

arising out of the defective performance of contracts; it does not categorically bar all

tort claims arising from a contractual or business relationship.  *Ulbrich v. Groth*, 310

Conn. 375, 410–12 (2013); *LPP Mortg. Ltd. v. Underwood Towers Ltd. P'ship*, 205

Conn. App. 763, 784 (2021).  Breach of fiduciary duty is a tort claim, and Connecticut

law separately codifies fiduciary duties owed by members of a member-managed

---

[152] Am. Compl. ¶¶ 96–119, 240–42.

[153] Am. Compl. ¶ 117.  The Court does not revive Plaintiff's dismissed statutory records claim. *See* Voluntary Dismissal, ECF No. 113.  The Court considers the alleged denial of information only to the extent Plaintiff preserved it as part of her direct fiduciary-duty theory.

limited liability company to the company and, subject to statutory limitations on direct actions, to the other members. *See* Conn. Gen. Stat. §§ 34-255h(a), 34-271(b). Defendants' reliance on the economic-loss doctrine therefore does not bar Plaintiff's direct fiduciary duty claim.

151. Accordingly, Defendants' Motion for Partial Summary Judgment is **GRANTED** to the extent Plaintiff's Ninth Individual Cause of Action seeks recovery for injuries suffered solely by Nurse Source. The Motion is otherwise **DENIED** as to Plaintiff's Ninth Individual Cause of Action for Breach of Fiduciary Duty.

## L. **Applicability of Section 9.1(b) of the Operating Agreement**

152. Defendants also seek summary judgment that Section 9.1(b) of the Operating Agreement limits Ms. Court's and Ms. Peirce's individual liability on all claims asserted against them.[154]

153. The Court declines to enter that ruling. Regardless of the precise scope of Section 9.1(b), Connecticut law provides that an operating agreement may not "relieve or exonerate a person from liability for conduct involving bad faith, willful [sic] or intentional misconduct, or knowing violation of law." Conn. Gen. Stat. § 34-243d(c)(7). Several surviving claims require resolution of whether Ms. Court or Ms. Peirce acted in bad faith, for personal benefit, or in breach of duties owed to Nurse Source or Ms. Vincelette. Section 9.1(b) therefore cannot support the categorical limitation of liability Defendants seek at summary judgment.

---

[154] Br. Supp. Defs.' MSJ 26–27.

154. Accordingly, Defendants' Motion for Partial Summary Judgment is **DENIED** to the extent it seeks a ruling that Section 9.1(b) limits Ms. Court's and Ms. Peirce's individual liability on all claims asserted against them.

## M. Plaintiff's Request for Punitive Damages

155. Defendants seek summary judgment on Plaintiff's request for punitive damages. They contend that punitive damages are unavailable for Plaintiff's breach of contract claims and that Plaintiff's tort claims fail as a matter of law.[155]

156. The Court agrees with Defendants that punitive damages are not recoverable for breach of contract alone absent an independent tort. *See McCarter & English, LLP v. Jarrow Formulas, Inc.*, 351 Conn. 186, 211 (2025) (holding that punitive damages are not available for breach of contract absent an independent tort); *SciGrip, Inc. v. Osae*, 373 N.C. 409, 428 (2020).

157. Defendants' argument fails, however, because the Court has not dismissed all tort-based claims. The Court has denied summary judgment in part on Plaintiff's Second Derivative Cause of Action for breach of fiduciary duty, Fifth Derivative Cause of Action for civil conspiracy, and Ninth Individual Cause of Action for breach of fiduciary duty. Those surviving claims include allegations and evidence that could support a finding of self-interested or intentional wrongdoing on at least some surviving tort-based theories.

158. The Court does not determine at this stage whether Plaintiff will ultimately be entitled to punitive damages, whether the evidence will support submission of

---

[155] Br. Supp. Defs.' MSJ 27.

punitive damages to the factfinder, or the proper measure of any such damages. It holds only that Defendants have not shown that punitive damages are unavailable as a matter of law on the present record.

159. Accordingly, Defendants' Motion for Partial Summary Judgment is **DENIED** as to Plaintiff's request for punitive damages.

## IV.

## CONCLUSION

160. **WHEREFORE**, for the reasons set forth above, the Court hereby **GRANTS in part and DENIES in part** Plaintiff's Motion and **GRANTS in part and DENIES in part** Defendants' Motion as follows:

a. Plaintiff's Motion is **DENIED** as to the First Derivative Cause of Action.

b. Defendants' Motion is **GRANTED** as to the remaining portions of the First Derivative Cause of Action, which are **DISMISSED** with prejudice.

c. Defendants' Motion is **GRANTED** as to the Second Derivative Cause of Action to the limited extent that claim rests on Ms. Court's refusal to sell Nurse Source. Defendants' Motion is otherwise **DENIED** as to the Second Derivative Cause of Action.

d. Defendants' Motion is **GRANTED** as to the remaining Third Derivative Cause of Action for Breach of Contract against Ms. Peirce, which is **DISMISSED** with prejudice.

e. Defendants' Motion is **GRANTED** as to the Fourth Derivative Cause of Action for Specific Performance, which is **DISMISSED** with prejudice.

f. Defendants' Motion is **GRANTED** as to the Fifth Derivative Cause of Action to the extent Plaintiff predicates that claim on Ms. Peirce's alleged breach of the Settlement Agreement or the purported invalidity of the 5 June 2023 Written Consent. Defendants' Motion is otherwise **DENIED** as to the Fifth Derivative Cause of Action.

g. Plaintiff's Motion is **GRANTED** as to the First Individual Cause of Action to the extent Plaintiff seeks a declaration that Ms. Vincelette was not employed by Nurse Source. Plaintiff's Motion is **DENIED** as to the First Individual Cause of Action to the extent Plaintiff seeks a declaration that Ms. Peirce lacked authority to vote on the 7 August 2023 Written Consent.

h. Defendants' Motion is **GRANTED** as to the First Individual Cause of Action to the extent Defendants seek a declaration that Ms. Peirce had authority to vote on the 7 August 2023 Written Consent.

i. Plaintiff's Motion is **DENIED** as to the Second Individual Cause of Action. The Court nevertheless determines as a matter of law that Section 11.14 of the Operating Agreement did not authorize the purchase of Ms. Vincelette's Units at fifty percent of Appraised Value because Ms. Vincelette was not employed by Nurse Source. The issues of whether Cause existed under Section 5.4(c), the legal effect of the 7

August 2023 Written Consent, and any resulting damages remain for further proceedings.

j.  Plaintiff's Motion is **GRANTED** as to the Fourth Individual Cause of Action to the extent Plaintiff seeks judgment against Nurse Source in the principal amount of $258,000, with post-judgment interest as provided by law.  Plaintiff's Motion is otherwise **DENIED** as to the Fourth Individual Cause of Action.

k.  Defendants' Motion is **DENIED** as to the Fourth Individual Cause of Action to the extent Defendants seek dismissal of Plaintiff's claim based on Nurse Source's alleged agreement to pay Wellspring Group $72,500.

l.  Defendants' Motion is **GRANTED** as to the Sixth Individual Cause of Action to the extent Plaintiff seeks recovery in unjust enrichment for benefits conferred before 16 April 2021.  Defendants' Motion is otherwise **DENIED** as to the Sixth Individual Cause of Action.

m.  Plaintiff's Motion is **DENIED** as to the Eighth Individual Cause of Action.

n.  Defendants' Motion is **GRANTED** as to the Eighth Individual Cause of Action, which is **DISMISSED** with prejudice to the extent it seeks advancement or present indemnification for expenses incurred in prosecuting this action.

o.  Defendants' Motion is **GRANTED** as to the Ninth Individual Cause of Action to the extent Plaintiff seeks recovery for injuries suffered solely

by Nurse Source. Defendants' Motion is otherwise **DENIED** as to the Ninth Individual Cause of Action.

p. Defendants' Motion is **DENIED** to the extent Defendants seek a ruling that Section 9.1(b) of the Operating Agreement limits Ms. Court's and Ms. Peirce's individual liability on all claims asserted against them.

q. Defendants' Motion is **DENIED** as to Plaintiff's request for punitive damages.

r. Except as expressly granted above, Plaintiff's Motion and Defendants' Motion are **DENIED**.

**SO ORDERED**, this the 21st day of July 2026.

/s/ A. Graham Shirley
A. Graham Shirley
Special Superior Court Judge
 for Complex Business Cases